IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| JOANN WOODS, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:12-CV-112 |
| | ) | |
| KEITH TITUS CORPORATION, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

This case arises out of a fatal collision between a pick-up truck and a tractor-trailer. Although the case was originally filed in this court, a parallel action is pending in the Circuit Court of Roane County, Tennessee.

Plaintiffs, the surviving spouse and children of the pick-up driver, contend that this court has subject matter jurisdiction based on diversity of citizenship. According to their complaint: plaintiffs are citizens of Tennessee; the corporate trucking defendants are citizens of New York; and defendant David Burkhart ("Burkhart"), the driver of the tractor-trailer, is "a citizen and permanent resident of the State of Pennsylvania."

Defendants have filed a "Motion to Dismiss for Lack of Diversity Jurisdiction" [doc. 20] under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing that complete diversity of citizenship is lacking because Burkhart was actually domiciled in Tennessee when this suit was commenced. The motion has been extensively briefed by all parties. Oral argument is unnecessary. For the reasons that follow, the motion will be

granted and this case will be dismissed.

I.

*Relevant Authority*

Plaintiffs, as the parties invoking the court's subject matter jurisdiction, have the burden of demonstrating by a preponderance of the evidence that complete diversity of citizenship exists. *See, e.g., Everett v. Verizon Wireless*, 460 F.3d 818, 829 (6th Cir. 2006). "[T]here must be complete diversity such that no plaintiff is a citizen of the same state as any defendant." *V&M Star, LP v. Centimark Corp.*, 596 F.3d 354, 355 (6th Cir. 2010). Further, "federal jurisdiction is tested according to the facts as they exist at the time an action is initiated." *Television Reception Corp. v. Dunbar*, 426 F.2d 174, 177 (6th Cir. 1970). Plaintiffs filed this lawsuit on March 9, 2012.

Citizenship for purposes of the diversity statute, 28 U.S.C. § 1332(a), "means domicile rather than residence." *Stifel v. Hopkins*, 477 F.2d 1116, 1120 (6th Cir. 1973). "[D]omicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989). "To acquire a domicile within a particular state, a person must be physically present in the state and must have either the intention to make his home there indefinitely or the absence of an intention to make his home elsewhere." *Stifel*, 477 F.2d at 1120.

II.

*Analysis*

Regarding his March 9, 2012 domicile, defendants ask the court, "Who better to determine Defendant Burkhart's intentions than Defendant Burkhart himself?" [Doc. 90, p.5]. Unfortunately, the matter is not quite so simple, primarily due to credibility concerns with Burkhart's testimony.

> While one's statements may supply evidence of the intention requisite to establish domicile at a given place of residence, they cannot supply the fact of residence there. One's testimony with regard to his intention is of course to be given full and fair consideration, but is subject to the infirmity of any self-serving declaration, and may frequently lack persuasiveness or even be contradicted or negatived by other declarations and inconsistent acts. In such circumstances, the plain facts as to the place of residence . . . and [the] real attitude and intention with respect to it as disclosed by the entire course of conduct . . . are the controlling factors in ascertaining . . . domicile.

*Campbell v. Oliva*, 295 F. Supp. 616, 618 (E.D. Tenn. 1968) (citations and quotations omitted).

In its analysis, this court will first review Burkhart's representations as well as his apparent *mis*representations. The court must then necessarily consider the other pertinent evidence in this case in order to determine Burkhart's true intention "as disclosed by the entire course of conduct . . . ." *Id.* Throughout, the court remains mindful that it is the plaintiffs who bear the burden of demonstrating by a preponderance of the evidence that Burkhart was not domiciled in Tennessee on March 9, 2012. *See Everett*, 460 F.3d at 829.

3

### A. Burkhart's Position

In his August 13, 2012 affidavit, Burkhart stated that he moved to Tennessee from Pennsylvania in November 2010, with the intention of staying in Tennessee. As of August 2012, Burkhart represented that he intended to remain in Tennessee, with no plans to move back to Pennsylvania. According to the affidavit, Burkhart considered himself a permanent resident of Tennessee, and not Pennsylvania, beginning in November 2010.

### B. Inconsistencies

Defendant Burkhart is married. For much of the time period relevant to this litigation, his wife Julia has remained in Pennsylvania living at various addresses. As will be discussed below, the record indicates that there are recurring marital problems and the couple has on more than one occasion considered themselves separated. Plaintiffs experienced great difficulty locating Mrs. Burkhart to depose her.

At his own deposition, defendant Burkhart testified that he lived in his first Tennessee residence (on Shirland Court) "for several months" beginning in November 2010. He further testified that "my wife and I" both signed the lease. Burkhart produced a lease purporting to be signed by both him and Mrs. Burkhart.

However, the affidavit of the owner of the Shirland Court condominium states that Burkhart never lived there or made any payments other than his deposit, and that Mrs. Burkhart's signature is not on the original lease. Mrs. Burkhart subsequently testified that she has never signed a Tennessee lease nor has she authorized her husband to do so on her

4

behalf.

In his December 17, 2012 interrogatory responses, defendant Burkhart represented 13 times that he "is not in contact with his wife and has no way of knowing her current address or obtaining any of Plaintiffs' requested information relating to Julia Burkhart." At his January 2013 deposition, Burkhart testified that his interrogatory responses were truthful and accurate, and that he had not been in contact with his wife since November 2012.

However, at her April 2013 deposition Mrs. Burkhart testified that the couple was in contact every day from September 2012 through April 2013, and that she was living in Tennessee on the date Burkhart signed his interrogatory responses. Further, according to Mrs. Burkhart, the couple spent Christmas Eve 2012 together at her mother's house in Pennsylvania. Lastly, Burkhart testified that he was not financially supporting his wife, but Mrs. Burkhart confirmed that he was.

Defense counsel argues that "any inconsistent statements or testimony by Defendant Burkhart, while improper (and without the knowledge or approval of his counsel), were simply misguided attempts to protect Julia Burkhart from controversy and forced participation in this lawsuit. From Defendant Burkhart's point of view, this is purely a lawsuit over a motor vehicle accident, and Defendant Burkhart's failure to recognize the importance of his testimony regarding Julia Burkhart's whereabouts has caused considerable headache for all involved." [Doc. 90, p.8]. Regardless of Burkhart's motivation, the above-

5

cited inconsistencies have rendered his testimony unreliable. The court will therefore now look to other indications of Burkhart's true domiciliary intent "as disclosed by the entire course of conduct . . . ." *Campbell*, 295 F. Supp. at 618.

### C. Course of Conduct

In resolving a Rule 12(b) factual attack on its subject matter jurisdiction, a district court "has wide discretion" to consider affidavits and other evidence without the motion being converted to one for summary judgment. *See Ohio Nat'l Life Ins. v. United States of America*, 922 F.2d 320, 325 (6th Cir. 1990).

> When a party's domicile is in doubt, courts must utilize a totality of the circumstances, case-by-case approach, weighing a variety of relevant factors. Factors frequently taken into account include: the party's current residence; voter registration and voting practices; situs of personal and real property; location of brokerage and bank accounts; membership in unions, fraternal organizations, churches, clubs, and other associations; place of employment or business; driver's license and automobile registration; payment of taxes; as well as several other aspects of human life and activity. No single one of these factors is dispositive, and the analysis does not focus simply on the number of contacts with the purported domicile, but also their substantive nature.

*Ford Motor Co. v. Collins*, No. 11-15011, 2011 WL 5877216, at *2 (E.D. Mich. Nov. 23, 2011) (internal quotation marks and citations omitted). The court will now consider these factors in turn.

### 1. Current Residence

The record does not give a clear picture of defendant Burkhart's residence between November 2010 and October 2011. At least as of mid-April 2011, he was sleeping in the sleeper compartment of his tractor (in Tennessee). In September 2011, Burkhart

6

applied to live in the Amberleigh Bluff apartment complex in Knoxville, Tennessee. On that application, he gave a current address in Pennsylvania (of three years duration), but also wrote that he was "relocati[ng] due to occupation."

As of the March 9, 2012 filing of this lawsuit, Burkhart had maintained a one-bedroom apartment with minimal furnishings at Amberleigh Bluff since October 2011. Mrs. Burkhart did not sign that lease. As of May 2012, she had not yet been to the apartment. Burkhart testified that he wanted his wife to move to Tennessee but that she did not want to.

From February through July 2012, Mrs. Burkhart was living in a Pennsylvania condominium owned by her mother. At his May 2012 deposition, Burkhart testified that his wife intended to move to Tennessee the following August. He further explained,

> I am bringing Julia down to move down here with the intentions of living together and staying here. Our son lives in, one of them lives in Clarksville [Tennessee] over here, he is in the Army, and the other son lives down in Pensacola, so it is kind of right in the middle, getting to see everybody.

In June 2012, Burkhart moved into a two-bedroom apartment in the same Amberleigh Bluff complex. The condominium in which Mrs. Burkhart was living sold, and she then moved to Tennessee with her husband from mid-July through September 2012, bringing the family furnishings with her. She signed an Amberleigh Bluff lease addendum in September 2012.[1]

---

[1] Plaintiffs repeatedly criticize Burkhart for only renting "a temporary apartment" at Amberleigh Bluff. However, to state the obvious, apartments are by nature almost always "temporary." Further, while there is evidence that the Amberleigh Bluff complex specializes in short-term leases, *Burkhart's lease* was for one year, and he in fact rented an apartment there for almost 18 months.

7

In a September 2012 affidavit, Mrs. Burkhart stated that as of April 2012 her husband was a resident of Tennessee, not Pennsylvania. She specified that "[a]t all times pertinent to this litigation, and specifically in April [sic] 2012 when this Federal suit was filed, David and I experienced marital problems and were separated and living apart."

Plaintiffs argue that the Burkharts were not separated as often as they allege. For example, Burkhart testified that he and his wife were separated from March through October, 201<u>1</u>.[2] By contrast, plaintiffs represent that Mrs. Burkhart testified the couple had only been separated from September to November 201<u>2</u>. The deposition pages provided by plaintiffs do not support their assertion.

Plaintiffs filed page 21 of Mrs. Burkhart's deposition but not pages 19 and 20. At the top of page 21, Mrs. Burkhart references a period of separation from September through November 2012. However, without pages 19 and 20 to provide the context of the questioning, the court is unable to construe Mrs. Burkhart's answer as broadly as plaintiffs would like. More importantly, further down page 21 in response to the question, "Any other time period then that, to your memory, that you and Mr. Burkhart have lived apart because of marital difficulties?", Mrs. Burkhart responded,

> That is an interesting question. And the reason that I am saying that is because of, I mean, his job, I did live alone. . . . I did live alone, so that was part of the reason of our difficulties, and that was throughout our whole marriage . . . .

---

[2] Burkhart testified, "You know, it was an issue of, you know, moving to Tennessee on a permanent basis, while I was down here with work and, you know, her father was sick and he was dying, and, you know, we just, we kind of went our own ways there."

8

Plaintiffs also stress evidence that Burkhart would spend time with his wife in Pennsylvania.[3] For some period of time beginning in August of 2010, Burkhart would drive to Pennsylvania to visit Mrs. Burkhart on weekends once or twice a month. Burkhart continued to help pay his wife's Pennsylvania utility bills through at least January 2012. From February through July 2012, Burkhart would visit his wife at her mother's Pennsylvania condominium "[w]henever his job allowed." Mrs. Burkhart testified that the couple would see each other in Pennsylvania "whenever he would come through" but not "on a regular basis" from September through December of 2012. However, Mrs. Burkhart also testified that she was in Tennessee on "several occasions" in that same four-month period, and that she was "living" in Tennessee from early November through Christmas 2012.

Mrs. Burkhart considered moving back to Tennessee after November 2012 but could not find a job. In January 2013, Mrs. Burkhart posted on Facebook that "things have changed" in Tennessee and she was moving "us" back to Pennsylvania. She wrote, "I'm going home to be back around family and friends." As of her April 2013 deposition, Mrs. Burkhart testified that she was residing with her mother and intended to live on her own in the future. Defendant Burkhart moved out of Amberleigh Bluff in March 2013, citing a

---

[3] Similarly, plaintiffs argue that Burkhart's "entire family" remained in Pennsylvania. However, the Burkharts' three children are all adults and none of them have lived with their parents since 2007. The record indicates that none of the children were living in Pennsylvania on March 9, 2012.

9

"current lack of employment." He did not have a forwarding address to provide.[4]

Plaintiffs rely on *Broadstone Realty Corporation v. Evans*, 213 F. Supp. 261 (S.D.N.Y. 1962), for the proposition that "[t]he residence of a spouse and other family members is a highly persuasive indication of the place intended as a permanent home." [Doc. 79, p.3]. What *Broadstone* actually states, however, is that "a married man's domicile is presumed to be where his wife and family reside, *if that is at a permanent home, and there is no proof of separation. . . .* The acquisition of a new residence for occupancy during employment away from a permanent home is insufficient to rebut that presumption." *Id.* at 265 (citations omitted) (emphasis added). In this case, there is credible proof of separation and no proof of a single, permanent home in Pennsylvania. *Broadstone* is therefore not on-point.

The court has distilled what it considers to be the most pertinent evidence of the Burkharts' residences for the period around March 9, 2012. The court has endeavored to do so as briefly and as efficiently as possible but has nonetheless generated more than three pages of text. In the court's mind, there are three primary contributors to this muddy picture: defendant Burkhart's job; Mrs. Burkhart's family concerns; and an unconventional marriage which clearly has its problems.

---

[4] On the date this suit was filed, Burkhart received his mail (including magazine subscriptions and pay statements) at a Tennessee address. That address, the same one listed on his Tennessee driver's license, was a post office box that he had maintained since March 2011. Plaintiffs argue that the use of a post office box indicates that Burkhart's presence in Tennessee was only meant to be temporary. Plaintiffs do not, however, contest that Burkhart had an apartment at Amberleigh Bluff from October 201<u>1</u> through March 201<u>3</u>.

10

In the end, the court credits defendant Burkhart's representation that he moved to Tennessee in November 2010 with the intention of staying in that state. The court reaches that conclusion despite Burkhart's inconsistent statements, most of which were apparently an attempt to shield the location of his wife from plaintiffs' attorney. The court agrees with plaintiffs' counsel that Burkhart's misstatements have "pollut[ed] the record," but declines plaintiffs' request to consider Burkhart's "improper tactics and false statements" as "part of his relevant 'course of conduct' on the issue of Mr. Burkhart's domicile." [Doc. 79, p.26]. The issue herein is Burkhart's March 9, 2012 domicile - not whether he has engaged in sanctionable misconduct.

The filing date of this lawsuit falls within an 18-month period in which Burkhart rented an apartment in Tennessee. Soon after March 9, 2012, Burkhart transferred to a larger apartment, consistent with the representation that it was always his intention for his wife to join him in Tennessee. The court finds Mrs. Burkhart's affidavit and testimony to be credible and persuasive. Defendant Burkhart's credibility issues do not automatically transfer to his wife. In fact, Mrs. Burkhart's testimony is made more credible by the fact that it does not line up with her husband's. If there was a concerted effort by the couple to present misleading testimony, it is unlikely that Mrs. Burkhart would have contradicted her husband on so many key points.

Mrs. Burkhart's affidavit states that her husband was a resident of Tennessee in April 2012. That statement is believed, as is Mrs. Burkhart's testimony regarding the

11

couple's separations and reconciliations. The court concludes that the factor of Burkhart's "current residence" <u>as of March 9, 2012</u>, weighs in favor of Tennessee domicile. That conclusion is further supported by the fact that it was Mrs. Burkhart - and not her husband - who was at times moving back and forth between Tennessee and Pennsylvania.

### 2. Voter Registration and Voting Practices

Burkhart is not registered to vote in Tennessee, but he is not registered in any other state either. The court deems this factor neutral regarding the place of domicile.

### 3. Location of Personal and Real Property

As of his May 2012 deposition, Burkhart's Amberleigh Bluff apartment was furnished only with a bed, a couch, a television, and "odds and ends." All of the Burkharts' other furniture remained in Pennsylvania. There is no evidence of real property ownership in either Pennsylvania or Tennessee.

Mrs. Burkhart moved the couple's furnishings to Tennessee in July 2012. As of April 2013, those items were in storage in Tennessee. When Burkhart moved out of Amberleigh Bluff in the first quarter of 2013, the complex manager inspected the apartment and found "little evidence that the apartment had been occupied. It was essentially move-in ready for another tenant."

Plaintiffs argue that Burkhart's 18-month rental at Amberleigh Bluff was done only as either a "convenience" to accommodate his Tennessee driving route or as a ruse to avoid Pennsylvania income tax. That argument - that someone would spend more than

12

$1,000.00 per month on an unused apartment as a "convenience" or to avoid income tax - is not one that this court finds persuasive. Additionally, the manner in which Burkhart decorates and/or cleans his home is not an issue which is presently on trial. It is undisputed that the Burkharts' furnishings were in the Amberleigh Court apartment for a number of months. The condition in which defendant Burkhart left that apartment is not a material issue.

The fact that Burkhart brought few furnishings with him to Tennessee is somewhat suggestive of Pennsylvania domicile. The fact that Mrs. Burkhart moved the couple's belongings to Tennessee shortly after this suit was filed is more probatively indicative of Tennessee domicile. The court therefore concludes that this factor weighs in favor of Tennessee domicile.

4. Location of Brokerage and Bank Accounts

According to his affidavit, Burkhart maintained bank accounts at First Tennessee Bank and SunTrust Bank in Tennessee, and the First Tennessee account was opened in November 2010. As of the date of his May 2012 deposition, Burkhart still maintained bank accounts at Dollar Bank and First Commonwealth Bank (both in Pennsylvania), but the statements for those accounts were mailed to his Tennessee address. This factor weighs in favor of Tennessee domicile.

13

### 5. Membership in Unions, Fraternal Organizations, Churches, Clubs, and Other Associations

On the date suit was filed, Burkhart had an active Tennessee AAA membership. That membership expired the following month. There is no indication that the account was ever renewed in Tennessee, but there is also no indication that the membership was transferred to any other state. The record contains little to no additional information regarding Burkhart's membership in a church or any other organization. This factor weighs in favor of Tennessee domicile, but only slightly.

### 6. Place of Employment or Business

According to his August 2012 affidavit, Burkhart had worked at the same job with Page Transportation in Tennessee from September 2010 through August 2012. There is no contradictory proof. This factor weighs in favor of Tennessee domicile.

### 7. Driver's License and Automobile Registration

Burkhart's only driver's licence, issued in March 2011, is a Tennessee commercial license. All three of Burkhart's vehicles are titled in Tennessee, and were on the date this suit was filed. This factor weighs in favor of Tennessee domicile.

### 8. Payment of Taxes

According to his affidavit, Burkhart did not pay Pennsylvania income tax after May 2010. There is no contrary proof, nor is there evidence that Burkhart ever had sufficient income to owe Tennessee income tax. This factor weighs slightly in favor of Tennessee domicile.

### 9. Other Considerations

There are a few additional miscellaneous facts. Burkhart obtained a Tennessee hunting license in March 2011. As of May 2012, Burkhart's cell phone number still had a Pennsylvania area code. The account also still listed a Pennsylvania address, but all billing was done online. Burkhart testified that his provider told him changing to a Tennessee number would have increased his rate. In this age of cell phone contracts, the court does not find that statement implausible.

Burkhart's 2011 Department of Transportation physical took place in Tennessee. His last dentist visit was in Pennsylvania in early 2010. Burkhart testified that he does not have health insurance and had not needed to see a physician "in years." There is no evidence to the contrary.

The court does not consider these miscellaneous facts to weigh strongly either in favor of or against Tennessee domicile.

### III.

*Conclusion*

Defendant Burkhart claims that on March 9, 2012, he was a resident of Tennessee and intended to remain in that state indefinitely. The court has considered the substantive nature of numerous domicile-indicative factors. Those factors, on the whole, preponderate in favor of Burkhart's claim. Therefore, plaintiffs have not demonstrated by a preponderance of the evidence that complete diversity of citizenship exists in this case.

15

Defendants' "Motion to Dismiss for Lack of Diversity Jurisdiction" [doc. 20] must be granted. An order consistent with this opinion will be entered.

ENTER:

s/ Leon Jordan
United States District Judge